# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO
# SENIOR JUDGE MARCIA S. KRIEGER

Criminal Action No. 18-cr-00020-MSK-GPG

**UNITED STATES OF AMERICA,**

　　Plaintiff,

v.

**LUIS ALFONSO LEON,**

　　Defendant.

---

### OPINION AND ORDER OVERRULING OBJECTIONS AND DENYING MOTION TO SUPPRESS
---

　　**THIS MATTER** comes before the Court on Mr. Leon's Objections **(# 57)** to the Magistrate Judge's Recommendation **(# 48)** that Mr. Leon's Motion to Suppress **(# 23)** be denied, and the Government's response **(# 58)**.

## FACTS

　　Mr. Leon is charged in a one-count Indictment **(# 1)** with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). Mr. Leon was apprehended in a traffic stop on Interstate 70 near Grand Junction, Colorado on December 28, 2017. A physical search of the vehicle yielded the drugs in question. Mr. Leon moved **(#23)** to suppress the search on various grounds as discussed *infra*. The Court referred the motion to the Magistrate Judge for a recommendation. The Magistrate Judge conducted a two-day evidentiary hearing on December 12 and 28, 2018. On February 12, 2019, the Magistrate Judge issued a Recommendation **(# 48)** that Mr. Leon's motion be denied. Mr. Leon filed timely Objections **(# 57)** to that Recommendation, and the Court now considers those Objections.

## ANALYSIS

### A. Standard of review

The Magistrate Judge's Recommendation was issued pursuant to 28 U.S.C. §636(b)(1)(B). Under that statute, this Court makes a "*de novo* determination of those portions of the . . . recommendations to which objection is made." Notably, the requirement is that this Court conduct a *de novo* <u>determination</u>, not necessarily a *de novo* <u>hearing</u>. The Court is possessed of wide discretion to accept, reject, or modify the Magistrate Judge's proposed findings, including resolving issues of credibility. *U.S. v. Raddatz,* 447 U.S. 667, 676 (1980).

### B. Initial stop

A traffic stop is a seizure under the Fourth Amendment, and thus the officer initiating it must have reasonable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *U.S. v. Salas*, 756 F.3d 1196, 1200-01 (10th Cir. 2014). Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances; the officer's subjective motivation for the stop is irrelevant. *Id.* at 1201. The Government bears the burden of proving the reasonableness of the officer's suspicion at all pertinent stages of the encounter. *U.S. v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).

On December 28, 2017, at approximately 7:20 a.m., Colorado State Trooper Shane Gosnell was parked at an emergency crossover, observing eastbound traffic on Interstate 70 near the Mack, Colorado exit. He observed a silver pickup truck traveling in the left lane with no other traffic around it. Believing that the driver of the pickup truck was in violation of Colorado traffic law, Trooper Gosnell pulled out with the intent to stop and cite the driver. Trooper Gosnell testified that, due to terrain and highway conditions, the vehicle was "out of my sight for

just a few moments as I was catching up."[1] Trooper Gosnell, traveling in the left lane, approached the rear of the pickup, now traveling in the right lane. Trooper Gosnell testified that he did so to ascertain how many occupants were in the vehicle and to look for any other violations. Shortly thereafter, he dropped back, pulled behind the pickup, and activated his emergency lights. The pickup promptly pulled over to the side of the road.

The Court pauses at this point in the narrative to determine whether Trooper Gosnell's initial stop of the vehicle was supported by reasonable suspicion. It was. Trooper Gosnell's testimony was that he observed the pickup driving in the left hand lane of the highway while no other traffic was present. C.R.S. § 42-4-1013(1) provides that, on a highway such as Interstate 70, "a person shall not drive . . . in the passing lane . . . unless such person is passing other motor vehicles." Mr. Leon argues in his Objections that Trooper Gosnell "did not in fact observe the violation claimed, rather it was a pretext for the stop." But there is no evidence in the record that fundamentally disputes Trooper Gosnell's version of events – *e.g.* Mr. Leon did not testify that, contrary to Trooper Gosnell's assertions, he remained in the right lane of the highway at all pertinent times. Mr. Leon is correct that there are minor discrepancies in Trooper Gosnell's testimony on certain collateral details (such as whether the pickup was out of his sight for mere "moments" or a lengthier period of time, or whether the pickup returned to the right lane before or after Trooper Gosnell activated his emergency lights), but those discrepancies do not meaningfully undercut Trooper Gosnell's credibility regarding initially observing the pickup

---

[1] A video recording taken from Trooper Gosnell's dashboard camera was entered into evidence. That video begins when Trooper Gosnell is already underway on the highway and traveling at approximately 88 miles per hour; the silver pickup is not immediately visible. The low-light conditions and quality of the video make it difficult to ascertain precisely when Trooper Gosnell could first see the pickup, but a rough approximation is that the pickup came into view about 75 seconds after the video begins.

3

driving in the left lane without passing. The Magistrate Judge found Trooper Gosnell credible on this point and this Court sees nothing in the record that would suggest that that finding is erroneous. Accordingly, the Court credits Trooper Gosnell's testimony and finds that the initial stop was justified by a reasonable suspicion that the driver of the pickup truck had violated C.R.S. § 42-4-1013(1).

### C. Initial contact with Mr. Leon

After coming to a stop, Trooper Gosnell immediately left his vehicle and approached the passenger side of the pickup. Trooper Gosnell testified that, as he approached the vehicle, he glanced in the windows, both for safety purposes and to look for "potential indicators of criminal activity." Trooper Gosnell observed that "there were multiple boxes in the vehicle that were just kind of tossed in there," as well as "a bunch of clothing kind of thrown throughout the back seat of the vehicle." Trooper Gosnell observed that "it didn't look like valuables or belongings that you would see someone pack carefully in a vehicle," but rather, that "it looked like things were just tossed in there recklessly."

Upon arriving at the passenger-side door, Trooper Gosnell also noted that the key that was in the car's ignition was alone on its key ring. Trooper Gosnell considered this suspicious, as "most people you encounter, when I get a new vehicle, the first thing I do is change out the key ring to put my house keys, mailbox keys, all of those things on it." Trooper Gosnell also observed several food wrappers and drink containers on and around the passenger's seat. Trooper Gosnell described this as reflecting that the vehicle was "hard traveled," and that the driver had been "spending a lot of time in the vehicle." He considered this suspicious as well,

4

insofar as it would not be a "common thing" for a person who recently obtained a "new vehicle"[2] would "throw all of that stuff in there and [allow] it to be messy in a very short period of time." Trooper Gosnell testified that narcotics traffickers will "throw stuff in the vehicle for what I would term as a cover load, to make the vehicle harder to search."

The driver, now known to be Mr. Leon, rolled down the window and Trooper Gosnell explained the reason for the stop – that Mr. Leon had been driving in the left lane without passing. Mr. Leon's response is only minimally-audible on the video recording entered into evidence, but it appears that he apologized for the infraction and explained that "I've just been a little tired." Trooper Gosnell asked for Mr. Leon's license and registration and advised that, if all the documents were in order, Trooper Gosnell would only be issuing him a warning. Mr. Leon was fairly talkative – Trooper Gosnell testified that he perceived Mr. Leon to be "exaggerated or animated" and "overly friendly" -- responding that "those laws apply everywhere, huh? I need to start complying with them." Trooper Gosnell asked where he was headed. Mr. Leon replied that he was "going to stop at ISKCON, Denver. The International Society for Krishna Consciousness. I'm was going to stop there and pick up some books. Um, I believe there's going to be an event today." Trooper Gosnell had doubts about this explanation, as he felt it was implausible that "someone would travel twelve hours . . . overnight to puck up pamphlets that could be mailed and then to maybe stay for an event that they were unsure of even happening." Trooper Gosnell also noted Mr. Leon's use of the word "stop," suggesting that Denver was not actually his final destination.

---

[2] As discussed below, Trooper Gosnell eventually learned that Mr. Leon had recently purchased the vehicle.

At this point in time, Mr. Leon had produced his driver's license from Arizona.[3] Trooper Gosnell, having noticed that the pickup truck was registered in Minnesota, asked if Mr. Leon was from Arizona. Mr. Leon responded, "yeah, yeah, yeah. I'm from Arizona, yes sir." Then, after a brief pause, he added a partially-inaudible comment referring to "transitioning to Minnesota," to which Trooper Gosnell responded "I was just curious, because of the Minnesota plates." Trooper Gosnell testified that it was common for narcotics traffickers to be provided with vehicles with which to transport drugs, and that such vehicles' registrations do not always match where the driver resides.

It appears that, by this point, Mr. Leon had reached into a backpack and produced an envelope full of documents and invited Trooper Gosnell to search through them for the records Trooper Gosnell wanted. This action raised Trooper Gosnell's suspicions, in that in his experience, people keep documents relating to their vehicle in the vehicle itself, not in a backpack, and that they are usually familiar with the documents they have. Trooper Gosnell quickly located an insurance card, even though Mr. Leon had fumbled with the documents and been unable to produce one. Trooper Gosnell also located a registration document referencing a prior owner. He considered this suspicious, as vehicles provided to drug traffickers were often repeatedly registered in new drivers' names. Eventually, Trooper Gosnell located the documents he was looking for. Mr. Leon then asked if this was as cold as it gets in Colorado, and the two had a brief exchange about that.

Trooper Gosnell asked how long Mr. Leon had lived in Arizona. Mr. Leon responded that he "got his permanent residency in 2014," and began to tell as story about living there as a

---

[3] Trooper Gosnell testified that Phoenix, where Mr. Leon lived, is "a known origin for the transportation of narcotics." On cross-examination, however, Trooper Gosnell acknowledged that many locations in the United States would fit that description.

child. Trooper Gosnell interrupted and clarified that he was trying to determine how Mr. Leon came into possession of the truck and what the connection was with Minnesota. Mr. Leon began a story about how he lived there with a girl, and then moved in with his friend Marco, and that "he helped me out." Trooper Gosnell clarified "so this is his truck?," but Mr. Leon clarified that it was a friend of Marco's who gave him the truck at a "really, really, really, really good price." Trooper Gosnell inquired whether the truck was still registered to the friend because of the Minnesota plates, but Mr. Leon insisted that the truck was registered to him. It appears that the men continued to search through the papers looking for registration details. Trooper Gosnell asked if Mr. Leon knew the names of the people who sold him the vehicle and testified that Mr. Leon did not. Trooper Gosnell eventually asked how long ago Mr. Leon bought the truck, and Mr. Leon responded that it was approximately two weeks ago. Trooper Gosnell then located a bill of sale and title that seemed to indicate that Mr. Leon paid $500 for the truck. Trooper Gosnell considered that price to be suspiciously low for that particular vehicle and condition and that the purchase may have been a paper transaction only.

Trooper Gosnell asked how many miles were on the truck and Mr. Leon estimated 191,000, and looked at the sticker from a recent oil change to confirm. Trooper Gosnell asked whether the odometer would just show that, and Mr. Leon then looked at the odometer and confirmed that it was about 192,000. Mr. Leon explained that it had 189,000 miles on it when he bought it. Trooper Gosnell asked if he flew out to Minnesota to drive it back. Mr. Leon responded with a story that is not particularly audible, but Trooper Gosnell's testimony was that Mr. Leon reported that he had driven to Minnesota to pick up the vehicle, but the vehicle he drove to Minnesota was having mechanical issues so he sold that vehicle in Minnesota and drove

7

the truck back. Trooper Gosnell then explained that he was going to go back to his car to run the documents.

As he was walking back to his patrol car, Trooper Gosnell can be heard saying "Super nervous. He has all these walk-around stories. Like a story for every question." At the hearing, Trooper Gosnell testified that he was dictating these statements to himself, intending for them to be recorded by his microphone, as a reminder of his present impressions. Trooper Gosnell then sat in his car. Although the video recording introduced at the hearing captures the audio that subsequently occurs, the dashboard camera does not record any video of Trooper Gosnell inside his car. Thus, the following recitation combines both audio heard on the recording and Trooper Gosnell's testimony at the hearing about the following events.

Trooper Gosnell stated, to an unknown listener, "Says he's going to Denver. To some Krishna society to pick up some more books maybe? Says he thinks they have an event?" At the hearing, Trooper Gosnell testified that these statements were also dictated to his microphone to memorialize his present impressions. Shortly thereafter, Trooper Gosnell radioed in the license plate number of the pickup to a dispatcher. Trooper Gosnell testified that he did so simply for the safety purpose of advising the dispatcher that he had begun a stop (an act he would normally do before exiting his car at the beginning of the stop, but Trooper Gosnell stated that he chose to forego earlier in the incident due to other radio chatter going on). He denied that the report was a request for the dispatcher to check on the registration status of the plate, as Trooper Gosnell stated that he always does those checks himself from the computer in his patrol car. Nevertheless, the dispatcher immediately responds, reporting that the license plate is "clear" in Colorado and that Minnesota records show that it belongs to a 2006 silver Honda pickup truck.

Trooper Gosnell testified that, at some point, he contacted Deputy Miller, a fellow law enforcement officer, to come to the scene as a "cover officer." Trooper Gosnell explained that he did so "due to my suspicions [and] to also see what he thought." Trooper Gosnell testified that he "already had an idea of the route I believed I was going to take" – that is, to investigate whether Mr. Leon was involved in drug trafficking – and wanted to have Deputy Miller "there when it happened."

Trooper Gosnell then radioed a person named "Carmen" at the El Paso Information Center ("EPIC"), an information clearinghouse used by law enforcement officers. Trooper Gosnell asked Carmen if he could run license plate with her. There was a brief delay, and Trooper Gosnell was apparently transferred to an EPIC agent named Celine. In the interim, Trooper Gosnell began speaking to a person – subsequently identified as Deputy Miller of the Mesa County Sheriff's Office – who had arrived on the scene and was standing next to Trooper Gosnell's patrol car. Trooper Gosnell was speaking to Deputy Miller when Celine came back on the radio. Trooper Gosnell asked Celine to hold. He then stateed to Deputy Miller:

> So he's got a huge story for every question I ask him. He's from Phoenix. He says he's going to Denver to some Krishna society today to pick up some books and maybe attend an event if they have one. He bought the truck a couple weeks ago in Minnesota, brought it out here. His story – I'm like 'how'd you get it out here?' And he's like, 'well, I drove out there in another vehicle but it was in really bad shape and so I ended up selling it, and these guys sold this one to me for really cheap.' And it's got stuff, like, *stacked* in it. Like..."

Deputy Miller can be heard responding, but it is difficult to understand his statement. Trooper Gosnell responds to Deputy Miller, "I know. So I don't... It's just weird." Trooper Gosnell then begins an exchange with Celine over the radio, identifying himself and giving details from Mr. Leon's driver's license, the location of the incident, and the reason for why he stopped Mr. Leon.

9

The Court pauses the recitation at this point because several events -- the summoning and arrival of Deputy Miller's on the scene, and Trooper Gosnell's contacting of EPIC – all constitute an inflection point where the purpose of Trooper Gosnell's stop of Mr. Leon changed.[4] In *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1614 (2015), the Supreme Court explained that "[b]ecause addressing the [traffic] infraction is the purpose of [a] stop, it may last no longer than is necessary to effectuate that purpose." Thus, a police officer's authority to seize a driver "ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." Those tasks may include "determining whether to issue a traffic ticket, . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." But the stop may not be prolonged for the purpose of "detecting evidence of ordinary criminal wrongdoing" unless separate reasonable suspicion exists to support an additional delay. Even "*de minimis*" delays unrelated to the traffic violation trigger additional Fourth Amendment scrutiny. Thus, the Court's inquiry is whether the decision to turn attention to criminal, rather than traffic, investigation "prolongs – *i.e.* adds time to – the stop." *Id.* at 1614-1616.

Here, Trooper Gosnell's discussion with Deputy Miller and communications with EPIC delayed the completion of the traffic stop, even if briefly. The discussion with Deputy Miller and with EPIC did not relate to the purpose of the traffic stop – Mr. Leon's driving in the passing lane – and certainly, Deputy Miller had no insight to share as to whether or not Mr. Leon had violated the traffic law. It is clear from Trooper Gosnell's statements to Deputy Miller that the discussion concerned whether the circumstances suggested that Mr. Leon might be engaged in

---

[4] Trooper Gosnell testified that he would not ordinarily contact EPIC in the course of making a routine traffic stop, and that he does so only when he believes that a driver might be engaged in other criminal activity.

other criminal activity, not whether he had violated a traffic law. Indeed, Trooper Gosnell testified that he has discussions with people like Deputy Miller when "we have suspicion that something else is going on." Thus, at least for the period of time that Trooper Gosnell was conversing with Deputy Miller, and later with EPIC, Trooper Gosnell was prolonging the traffic stop. Thus, the Court next considers whether Trooper Gosnell had a reasonable suspicion of criminal activity by Mr. Leon at this point in time.

Cataloging the various items that allegedly contributed to Trooper Gosnell's suspicion at this point is a more complex task than it seems. Trooper Gosnell's explanation to Deputy Miller would seem to highlight the most important factors that concerned Trooper Gosnell at the time – (i) that Mr. Leon "had a story" in response to every question, that he had, (ii) that Mr. Leon was from Phoenix and traveling to Denver intending to pick up religious books and possibly attend an event; (iii) that he had recently purchased the vehicle in Minnesota and drove it back to Phoenix; and (iv) the vehicle had a lot of boxes and other items haphazardly placed in it. In his testimony, Trooper Gosnell summarized his suspicions at this point in time by identifying: (i) "a party traveling from a known origin to a known destination" for drug trafficking; (ii) "in a vehicle that they appeared to not know much about"; (iii) that the vehicle "was registered out of a different state and location than the driver's license"; (iv) "nervous behavior," in that Mr. Leon "spoke quickly, seemed unsure about his answers or that he had to think about his answers"; (v) the "look of a potential cover load in the vehicle"; (vi) Mr. Leon "knowing nothing about the purchase of the vehicle or the paperwork inside the vehicle"; and (vii) "what seemed as implausible travel plans." In its closing argument at the hearing, the Government suggested several additional items of evidence that warranted Trooper Gosnell's suspicion: (i) Mr. Leon's "animated" and talkative disposition; (ii) that Mr. Leon had all of his paperwork in a manila

11

envelope that seemed like "it had been provided to him" and that Mr. Leon simply gave the documents to Trooper Gosnell to find what was needed rather than locating the pertinent documents himself; (iii) that Trooper Gosnell immediately found an insurance card in the paperwork that Mr. Leon had been unable to find; (iv) that Trooper Gosnell could only locate a registration document for the vehicle in the name of someone else; (v) that Mr. Leon was unfamiliar with the friends who had sold him the car; (vi) that the answers that Mr. Leon gave about where he was living seemed to change and that his description of his travel plans were "very tentative and uncertain"; and (vii) that the vehicle had been driven "an exceptionally high number of miles in a very short period of time."[5] In addition to these factors, the Magistrate Judge also considered and relied upon Trooper Gosnell's testimony that Minnesota was "a known destination for the transportation of narcotics."

The Court need not analyze each proffered explanation individually. The reasonable suspicion standard "is not, and is not meant to be, an onerous [one]." *U.S. v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015). Although the Court might reject certain of the factors identified above as justifying a reasonable suspicion,[6] there remain sufficient factors that, taken as a whole, would support a reasonable suspicion by Trooper Gosnell that Mr. Leon was engaged in criminal

---

[5] At least two of these arguments by the Government seem to be refuted by the record, at least as it exists at this point in the narrative. Although the packet of documents that Mr. Leon handed to Trooper Gosnell seemed to contain a registration for the vehicle in the name of someone else, Trooper Gosnell appears to have eventually located a document that satisfied him that the vehicle was registered to Mr. Leon. Second, at this point in the narrative, Trooper Gosnell knew only that Mr. Leon had put approximately 3,000 miles on the vehicle in the two weeks since he obtained it, including driving it from Minnesota to Phoenix (a trip of at least 1,400 miles), and then from Phoenix to Grand Junction, Colorado (a trip of roughly 600 miles).

[6] Among others, the Court would reject the notion that a point of origin in Phoenix or a destination in Minnesota adds any material weight to the reasonable suspicion calculus. Trooper Gosnell testified that many locations around the nation are known sources or destinations for drug trafficking activity, and thus, there is no reason to assume that, simply because traffic is coming from Phoenix or destined for Minnesota, it is likely to involve drugs.

12

activity. The Court agrees with Trooper Gosnell that Mr. Leon was particularly loquacious and elliptical in his responses to several of Trooper Gosnell's questions, frequently volunteering meaningless detail or failing to provide direct answers. Whether one characterizes such responses as reflecting an unusually high degree of nervousness or treats them as purposeful evasiveness or obfuscation, the net effect is the same: they are indicia that can give rise to a reasonable suspicion of criminal activity. *See U.S. v. Moore*, 795 F.3d 1224, 1230-31 (10th Cir. 2015). Similarly, the Court also agrees that Mr. Leon's explanation of his travel plans, in which he mentioned an intention to make a "stop" in Denver but did not identify his final destination, had a degree of evasiveness to it. Mr. Leon argues that, when Trooper Gosnell's questions are carefully-parsed, his answers were responsive to the particular ways in which the questions were asked.[7] But taken as a whole, the Court finds that the content and delivery of Mr. Leon's remarks were sufficiently unusual as to legitimately raise Trooper Gosnell's suspicions. *U.S. v. Pettit*, 785 F.3d 1374, 1380-82 (10th Cir. 2015) (even plausible answers to questions can still, in totality, give rise to reasonable suspicion).

Mr. Leon's inability to clearly and concisely relate the circumstances under which he purchased the vehicle only two weeks earlier and why he did so some 1500 miles away from where he ostensibly resided also properly contributed to Trooper Gosnell's suspicions, as did his

---

[7] In his Objections, Mr. Leon attributes any misunderstandings to Trooper Gosnell's "generalized, vague and open-ended questions." But the Court is mindful that, to some extent, Trooper Gosnell's purpose in questioning a driver is not to use pinpoint-precise questions to elicit specific facts and minimal extraneous detail, as an attorney might on cross-examination. Rather, a police officer will typically ask generalized questions that invite an unstructured response from the driver, allowing the officer to assess a driver's capabilities and intentions from the way the driver chooses to respond.

unfamiliarity with his registration and other paperwork.[8] The 10th Circuit has acknowledged that a driver's recent registration of a high-mileage vehicle can be a relevant factor contributing a limited degree of weight to the reasonable suspicion calculus. *Moore*, 795 F.3d at 1230; *see also U.S. v. Berrelleza*, 90 Fed.Appx. 361, 362-64 (10th Cir. 2004). Several additional factors, such as Mr. Leon keeping his vehicle paperwork in a backpack rather than the vehicle itself, his possession of registration documents belonging to the vehicle's prior owner, also contribute some slight additional weight to Trooper Gosnell's belief that Mr. Leon might be involved in drug trafficking. Each of these factors, standing alone, might not be sufficient to create reasonable suspicion on Trooper Gosnell's part, but, taken as a whole, the record reflects numerous atypical circumstances that justified Trooper Gosnell in investigating further.

Accordingly, the Court finds that, at this point in the narrative, Trooper Gosnell had a reasonable suspicion that Mr. Leon was engaged in criminal activity so as to permit Trooper Gosnell to shift the focus of the stop from the traffic violation to an investigation into possible drug trafficking. As such, the discussion with Deputy Miller did not unnecessarily prolong the stop.

**D. Continued investigation**

The remainder of the analysis can proceed swiftly, particularly insofar as Mr. Leon does not raise any Objections based on events that occurred hereafter. Among the information that Trooper Gosnell ultimately received from EPIC was that Mr. Leon had been recorded as making "multiple border crossings from Mexico into the United States in the last year." The times of

---

[8] One might reasonably expect that an experienced driver like Mr. Leon, who had purportedly covered more than 3,500 miles on the road in just the last two weeks, would be readily familiar with the type and location of information that police officers would request during a traffic stop.

those trips were not sporadic and inconsistent with the routine border crossings a person might make for work or other regularly-conducted activity. Trooper Gosnell also noted that one trip to Mexico had occurred in November, only a month earlier, when Mr. Leon was ostensibly living in Minnesota. These facts increased Trooper Gosnell's suspicion that Mr. Leon was engaged in drug trafficking activity. Trooper Gosnell also learned that Mr. Leon had registered the vehicle in his own name at a Minnesota address, although he had previously told Trooper Gosnell that he had been a resident of Arizona since 2014. These facts, in addition to those described above, further supported Trooper Gosnell's reasonable suspicion.[9]

Trooper Gosnell then returned to Mr. Leon's vehicle, returned his documents, and issued a warning. Mr. Leon thanked him, and then offered him a religious book, launching into a lengthy explanation as to how the book would explain from where "philosophers like Plato and Socrates" derived their ideas. Trooper Gosnell again inquired about how long Mr. Leon would be in Denver. Mr. Leon responded "um, maybe – hopefully a day or two. Hopefully the whole day. And if it goes really well, at the event – if they decide to do the event the next day. . . I'm here for book distribution." Trooper Gosnell then ended the interaction, but quickly returned and asked if he could ask Mr. Leon some additional questions. He asked if Mr. Leon was carrying any illegal substances, and Mr. Leon said no. Trooper Gosnell asked whether Mr. Leon would consent to a search of the vehicle. Mr. Leon's response is inaudible, but the Court can assume he declined. Trooper Gosnell indicated that he nevertheless intended to conduct a canine search around the vehicle and asked Mr. Leon to step out. Trooper Gosnell eventually conducted the

---

[9] The Court does not necessarily ascribe significant weight to Trooper Gosnell's review of title records for the pickup truck, which revealed that it accumulated only 32,000 miles between 2005 and 2015, and then had some 160,000 miles put on it between 2015 and 2017. Although that pattern of usage is suspicious, nothing warranted Trooper Gosnell to assume that Mr. Leon was involved with the vehicle prior to his alleged purchase of it in December 2018.

canine search, the canine unit alerted, and a physical search of the vehicle eventually yielded the drugs in question.

In addition to the reasonable suspicion discussed above that remained extant, the additional circumstances discussed in this section bolster Trooper Gosnell's suspicions justifying a search of Mr. Leon's vehicle. Mr. Leon's frequent and irregular trips to Mexico, his vague and non-specific travel plans, and the revelation of further inconsistencies in his prior answers to Trooper Gosnell's questions all lend additional support to the conclusion that Trooper Gosnell had reasonable suspicion to detain Mr. Leon despite his lack of consent, to conduct the canine search, and, upon the canine unit's alert, to physically search the vehicle and discover the drugs.

Mr. Leon does not tender particular objections to this portion of the search, except to note certain inconsistencies between Trooper Gosnell's hearing testimony and the video of the physical search of the car, relating to when certain boxes were removed and when photographs were taken. The Court cannot say that those discrepancies materially influence the Court's assessment of Trooper Gosnell's credibility to the analysis here.

Accordingly, the Court finds that Trooper Gosnell had reasonable suspicion supporting each of the critical stages of the stop and search of Mr. Leon and his vehicle.

## **CONCLUSION**

For the foregoing reasons, Mr. Leon's Objections **(# 57)** are **OVERRULED**. The Magistrate Judge's Recommendation **(# 48)** is **ADOPTED** and Mr. Leon's Motion to Suppress

**(# 23)** is **DENIED**.  The parties shall contact the Magistrate Judge to arrange further proceedings in this case.

Dated this 13th day of June, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge